A92A0463, A92A0641. TRULOVE v. WOODMEN OF THE
 WORLD LIFE INSURANCE SOCIETY; and vice versa.
 (419 SE2d 324)

BEASLEY, Judge.

Trulove filed the present action against Woodmen, alleging that he had been induced by the fraud and misrepresentation of Woodmen's agent Jones to pay $10,000 as a deposit on an adjustable-rate life insurance certificate or policy which he later chose not to purchase, and although Jones assured Trulove that the money would be returned, Woodmen refused to return it. The jury returned a verdict in favor of Trulove for the $10,000 plus interest, attorney fees, and expenses under OCGA § 13-6-11. Woodmen filed alternative motions for j.n.o.v. or new trial. The trial court granted Woodmen's motion for j.n.o.v. and denied the motion for new trial.

In Case No. A92A0463, Trulove appeals the grant of the j.n.o.v. In Case No. A92A0641, Woodmen appeals the denial of its motion for new trial, in the event we reverse the grant of its motion for j.n.o.v.

Page 1 of the certificate states: "TEN DAY RIGHT TO EXAMINE CERTIFICATE: All premiums paid will be returned if the member wants to cancel this certificate within ten days from the date it is received. To cancel the certificate, give it to the Woodmen representative who delivered it or send it to the Home Office of the Society at 1700 Farnam Street, Omaha, Nebraska 68102." This is referred to by Woodmen as the statutory ten-day "free look" period. See OCGA § 33-15-11 (c). The policy is described as an "ADJUSTABLE LIFE INSURANCE CERTIFICATE DEATH BENEFIT PAYABLE AT DEATH PRIOR TO MATURITY DATE - CASH VALUE PAYABLE ON MATURITY DATE [-] ADJUSTABLE DEATH BENE-

FIT - FLEXIBLE PREMIUMS PAYABLE DURING LIFETIME OF MEMBER UNTIL THE MATURITY DATE." The "TOTAL ANNUAL PLANNED PREMIUM AND DUES" are stated as $4275.00, and the "FACE AMOUNT" is stated as $156,529 which "includes cash value."

Included on both pages one and two are statements that the issue date is September 28, 1989. Included on page two is that the certificate date is October 1, 1989; the maturity date is October 1, 2016; the maximum initial surrender charge is $6261.16.

Under the heading "SURRENDER VALUE," the certificate states, "Woodmen will pay the surrender value of this certificate, plus any refunds on deposit with Woodmen, to the member after receipt of this certificate and written request for surrender at the Home Office. The surrender value is the cash value less any debt with interest, and less any surrender charge." The certificate also allows "PARTIAL SURRENDER."

At the time of trial in March 1991, Trulove testified that he was a 74-year-old semi-retiree. He was in the lumber and sawmill business, does some work as a real estate broker, and has an auction license. He met Jones through a friend who had purchased supplemental Medicaid insurance from him and recommended him very highly. In August 1989, Jones came to Trulove's house in order to sell him supplemental Medicaid insurance. Jones told Trulove that the health insurance was a sideline, and that his "bread and butter" was selling life insurance policies issued by Woodmen of the World through which money could also be invested with deferred taxation of the interest.

Jones returned to Trulove's house on August 16 to deliver medicaid policies to Trulove and his father-in-law. At that time Trulove also signed an application for an adjustable life certificate, which was subject to a physical examination that was performed on Trulove at Woodmen's expense. A week later Trulove gave Jones a cashier's check in the amount of $10,000.

On October 18, the adjustable life certificate was delivered to him by Jones, and he signed a certificate delivery receipt as well as a document referred to by Woodmen as a "free-standing" ratification form, which Jones then returned to Woodmen. It stated that the planned premium had been increased in order for the certificate to remain in force beyond the first year for adjustable life. This was prompted by Trulove's physical examination. It is stated at the bottom of this form, "IMPORTANT - If this form is signed, this certificate immediately will be in force as of the certificate date shown on Page 2, or as of the date of the signing, whichever comes first. In any event, this form must be signed not later than OCTOBER 28, 1989 and returned to the Payment Adjustment Section or the certificate will be can-

celled." The "OCTOBER 28" date was marked through and replaced with a handwritten date of "November 4." A copy of this ratification form was included in the certificate left with Trulove, but Truelove retained it unsigned.

Under the certificate, Trulove was insured through October 1, 1990. The certificate was returned to Jones on November 3, 1989, and Woodmen received Trulove's request to cancel it on November 6. Woodmen informed Trulove by letter that it could not cancel the certificate since the request was received after the 10-day review period, and the ratification was signed on October 18. Woodmen stated in the letter that Trulove could "cash surrender" the certificate by completing and returning an enclosed form. He did not do that.

Trulove testified as follows. Based on representations by Jones, it was his understanding that Jones was offering him an adjustable life certificate for a one-time premium payment of $100,000. The $10,000 cashier's check represented a deposit in the event he decided to purchase the certificate, rather than a premium payment, and if he decided to purchase the certificate, he was to deliver an additional $90,000 to Jones. Trulove also testified that Jones represented to him that the ratification form related to an application for an increase in coverage from $156,529 to $200,000. He told Jones that before making a final decision he wanted his accountant and attorney to review the certificate, which they did. Based on their advice, he decided not to purchase the certificate, and he notified Jones of this, after October 28 but on or before November 4, the interlined date on the ratification form. Jones assured him that the $10,000 would be refunded. Trulove acknowledges that he signed the various forms bearing his signature without reading them, instead placing trust and reliance on oral representations by Jones inconsistent with the terms on the forms.

In granting the motion for j.n.o.v., the court found that there was no conflict in the evidence as to any material issue and that the evidence introduced, with all reasonable deductions therefrom, demanded a verdict in favor of defendant. See generally OCGA § 9-11-50; *Hiers-Wright Assocs. v. Manufacturers Hanover Mtg. Corp.*, 182 Ga. App. 732 (2) (356 SE2d 903) (1987). Specifically, the trial court found that the notice requirement was disclosed in bold print in plain English on the face of the policy; after the plaintiff decided too late, i.e., beyond the 10-day period, that he did not want the policy but wanted a refund, defendant offered to return the unearned portion of the premium as calculated from the policy; the insurance company continued the policy in force with full coverage until the policy lapsed for failure to pay the second year's premium and that is all defendant was required to do; under well-established law, after a policy of insurance is issued, prior representations of the agent afford no basis for

recovery.

1. Trulove concedes that under such cases as *Thomas v. Union Fidelity Ins. Co.,* 168 Ga. App. 267 (308 SE2d 609) (1983), oral statements by an agent of an insurance company generally cannot bind the insurance company, and, as recognized in such cases as *Powell v. James Hereford & McClelland,* 189 Ga. App. 747 (377 SE2d 683) (1989), one signing a document has a duty to read it and is bound by the terms of a document he does not read. Trulove argues there are facts from which the jury could have found that a confidential or fiduciary relationship existed between him and Jones, and, as recognized in *Powell,* this gives rise to an exception to the foregoing rules. "[A] party to a confidential or fiduciary relationship may rely upon representations made. . . ." *Dover v. Burns,* 186 Ga. 19, 25 (1) (196 SE 785) (1938).

Trulove relies upon the broad language of OCGA § 23-2-58: "Any relationship shall be deemed confidential, whether arising from nature, created by law, or resulting from contracts, where one party is so situated as to exercise a controlling influence over the will, conduct, and interest of another or where, from a similar relationship of mutual confidence, the law requires the utmost good faith, such as the relationship between partners, principal and agent, etc." Thus, some confidential relationships are created by law, some by contract, and others may be created by the facts of a particular case. *Cochran v. Murrah,* 235 Ga. 304, 306 (219 SE2d 421) (1975). The record is wholly devoid of evidence from which it could be found as fact that a confidential relationship existed between Trulove and Jones. The mere fact that one reposes trust and confidence in another does not create a confidential relationship. *Clinton v. State Farm Mut. Auto Ins. Co.,* 110 Ga. App. 417, 423 (2b) (138 SE2d 687) (1964).

2. The policy for which Trulove signed a receipt on October 18 stated on its first page that he could cancel it within ten days of its receipt. The ratification form stated that the policy would be in force immediately if it was signed, which it was. Trulove could not reasonably have been misled in these regards by the statement that it had to be signed no later than November 4 or would be cancelled by the *insurer,* because he signed it forthwith on October 18. Providing until November 4 for it to be signed did not affect the 10-day period, "from the date (the certificate) is received," for cancellation by the *insured,* even though the original signing period happened also to be 10 days.

3. Citing *Cox Broadcasting Corp. v. Nat. Collegiate Athletic Assn.,* 250 Ga. 391 (297 SE2d 733) (1982), Trulove argues that there was no enforceable contract because there was no meeting of the minds. As recognized in *Cox,* it is rudimentary contract law that in some instances the only conduct of the parties manifesting their intent is the express language of the agreement, whereas in other in-

stances the language is ambiguous, in which case the courts are free to consider extrinsic evidence of the parties' intentions. *Cox* was a case of the latter variety. This is a case of the former.

4. Attorney fees and expenses of litigation are not recoverable under OCGA § 13-6-11 unless other damages are recoverable. *Connell v. Houser*, 189 Ga. App. 158, 160 (5) (375 SE2d 136) (1988).

*Judgments affirmed. Birdsong, P. J., and Andrews, J., concur.*

DECIDED MAY 7, 1992 —
RECONSIDERATION DENIED MAY 28, 1992 — 

*William V. Evans,* for appellant.
*Preston & Preston, Robert H. Preston,* for appellee.